You said you'd take a break after this? After this one, yes. I said we may take a break after this. You may. I apologize. Like I said, I had to... I'm sorry. Can I reserve four minutes for rebuttal? Yes. Good afternoon. Let me ask you... Yes, sir. How is the sewer system in Baton Rouge today? The court system? Sewer system. Sewer system. I have no idea. He lives there. I live here. Okay. But the bypass is working, that much I do know. For us, yes, to hold on to this judgment, the district court had to rewrite the contract in this case, Louisiana law as it applies to this case, and the facts of this case. As we point out in our brief, the district court had to rewrite the contract by adding the word direct in front of access on these issues of direct access to the core. As opposed to our client merely acting as a conduit as specifically laid out in paragraph 11 of the contract. The district court then had to rewrite the law on the prompt payment act because the district... Because although it's a pay-when-paid situation, when we're paid, we have to pay. If we don't pay timely or notify them why we don't pay timely, we can be held accountable for 15% penalties and attorney's fees. Is your argument sort of in disparagement of the district court? A little bit, Your Honor. I apologize. But, yes, these were all put before the court to hopefully correct before we got here. Some did get corrected with the remediator. The rest did not. But you're saying the district court added words to the contract? Absolutely, Your Honor. I added the word direct. It's right in the opinion. If you take a look, if you compare paragraph 11 of the contract and the district court's opinion, the word direct is added. Is that material? Or was it a mistake? It was the whole crux of the delay claim. What our contract said was we were merely the conduit. We would never be responsible for delay damages. They would provide us the material. We would present it to the core. We would send any questions back. There's ad nauseum testimony about it, and it's covered in all the briefing. We were the conduit. That's the way we provided access. He added, at request of counsel, they argued, no, no, that meant direct contact, that we had to facilitate some kind of meeting with the core. Ask the man point blank, what document, what narrative did you present that did not get presented to the core? I'm not aware of that. That's his testimony. You know, at the end of the day, to show how important it is to us and to him that we present everything, this was a federal contract. We would have gotten a 15% markup on anything we could have gotten him paid for. In fact, on one of the delay claims, he did get paid $205,000. On the other delay claim, he did get paid a substantial amount of money. We would have gotten more. We did everything we could to get more money, and if you look at paragraph 11, it says we will never be liable. The core's decision is final. Our job was to present it to the core, and the core did what they did, and I understand he was upset with it. He chose to sue us for it. He did not sue Garner. He did not sue the core. Privity issues. But we provided everything we could to the core, and the judge rewrote the contract to add the word direct access. They also put on an expert who had never worked a core job in his life, and he came up with this notion that, well, it's a claim that the contractor's entitled to be in the room about. There's nothing about that in the contract that we have to provide access for some claim. So, yes, the district court added the word direct. On the prompt payment issue, it's a pay-when-pay situation. When we are paid, we have to pay him within two weeks or provide notice why we did not. We did not provide notice for six weeks, and then he is entitled to what he put on. He put on evidence that we received in August of 2012 $127,000 of money for him plus money for us. That money was paid in 2015, but more importantly what the district court did was 15% of that amount is, I forget, $18,000. The court allowed the jury to award $66,000. Additionally, much more painful, by that date, by October 2015, about a year before the trial when that money was paid, the court then awarded attorney's fees on everything, not just that $127,000 that had already been paid, but trial. To say trial is an understatement because we had four trial settings in this case and went up within a week of trial each time when some bizarre thing would happen and we'd get bumped, the last of which was the Baton Rouge torrential rainstorms that bumped our trial date. It was all understandable, but anybody knows that when you're preparing a case for trial, that's when you spend a disproportionate amount of money, and they were awarded $130,000 of attorney's fees, most of which took place long after that $127,000 had been paid. The court, at the request of RCS, the court really never addressed the district court. RCS, this issue of $84,000 of flagment, the court did not address it, but it's very clear from the contract, line item 50, RCS was obligated to pay for the flagment. The only way RCS is not obligated to pay for the flagment is if you rewrite the contract to say West Coast is responsible to pay for the flagmen. West Coast paid the flagmen and back-charged RCS. RCS takes issue with that. To prove that it was part of the overall scheme of things, on another change order, one specific change order, one that's not in dispute, RCS was awarded eight additional days to complete the contract, and they were given $8,000 for the flagmen during those eight additional days. It was an RCS expense. RCS takes issue and says, well, no, somebody from FH Passion, a non-party, they told us they were going to take care of it. Well, first of all, they're a non-party, but second, even more importantly, when you read the transcript as he cited it, those conversations took place before the contract was signed. When the contract was signed in August of 2010, those conversations had already taken place, and that line item appears, line item 50, flagmen is the responsibility of RCS. The last, as I guess I didn't state it, but this case was really about four change orders. I think I've covered the prompt payment penalty and the attorney's fees issue. The fourth change order was the back charges for the delay in getting this job done. My case was mainly made through their expert. When we went through, painstakingly went through the daily logs and RCS would disappear for weeks, if not months at a time, and he had no explanation for that, as there is no explanation for that. And so what we did is we took an overhead amount of the daily overhead account and we back charged him for the 111 days that he disappeared. This is before the end of the contract, when he simply failed to complete the contract. When he failed to complete the contract, it took us 120 days to complete it. And I'll explain why in a second, but I want to put that number in context. The original contract was only supposed to take 120 days. The excess, the extra time took us 120 days to complete. The specific costs other than the overhead were not that significant. The as-built drawings, the certifications, but it's very difficult to do as-built drawings when you've already paved over the bypass valve. So these things took us time. It took us time to complete the punch list that his own expert acknowledged he never completed, that his own expert acknowledged was a breach of the contract from walking off. Who is he you're referring to? RCS. RCS. Mr. Alonzo primarily. You're referring to West Coast. I'm West Coast. I'm beginning to understand the case a little better. So Mr. Householder, his expert acknowledged that it was a breach for him to walk off the contract, not complete the punch list, not provide the as-built. In fact, he held the as-built hostage, said he would not provide them unless we paid him these tremendous amounts of money that he ultimately asked the jury for, would not provide the certifications. We can't get paid until we provide these things to the Army Corps of Engineers, to the contractor who would provide it to the Corps. It's part of our contract. It's part of his contract. He simply refused to do it. What about that problem with the lines were not anchored or connected or something? Oh, yes. At the beginning of the job, the issue was it's a bypass valve, so was it secured or was it a slip valve? When you run pressure through it, could it just pop out? The belief was absolutely these were slip valves, and they needed to be reinforced with concrete. Mr. Alonzo believed that. Everybody believed that. But we're dealing with the Army Corps of Engineers. You cannot accept that, and Mr. Merrick testified to this, you cannot accept that as a fact until you uncover the specific valve that they were there to examine. The fact that they knew the valve just upstream was not reinforced is irrelevant. The Corps required that that specific valve be uncovered. To mobilize, uncover the valve, and as soon as they did in February of 2011, the Corps said, okay, we've got to redesign the project, because now we know that which we all suspected, and I apologize, but this is the way the federal government sometimes works. But now that we know what everybody knew, now that we actually see it and know it, the job needs to be redesigned. So through the grand pecking order, RCS was instructed at a meeting with the Corps, do you know somebody that can redesign this? Hooval was retained, and Hooval redesigned the joints. And who does that work in favor of in this case? Well, I think that works in favor of me, because unfortunately for RCS, Hooval became their subcontractor. They paid Hooval directly. They invoiced my client for Hooval's work. And so when this took quite a while to get redesigned, and the Corps looked at all of it, and they made a pronouncement that there was concurrent delay, including back in 2011 is when the Morganza spillway opened up for the first time in 40 years or something. The river had risen so high they wanted everybody off, away from the Mississippi River starting May 15th, I believe. And the plans were not ready until mid-September when they were finally approved. And there's some e-mails that say, hey, we got you everything you wanted on the redesign. Council, I think, has taken some issue and said, no, no, that was on everything, the delay claim. The e-mails are very clear. Those hadn't even been submitted yet. So the delay ultimately comes down on primarily Hooval, who was RCS's subcontractor. That's the first delay. The second delay, there was not much dispute over just how much the Corps was willing to pay. I think they submitted invoices and wanted something in the neighborhood of $380,000, and they were given $205,000. The Corps' decision is final. We didn't get the additional $175,000. This is not a pay-when-paid situation. Again, we would have gotten a markup from there. We're more than happy for them to get $380,000, but the Corps didn't give it to them. Corps' decision is final. And when you take that also to the prompt payment claim, how could we be responsible for money we've never received? Prompt payment claim is essentially pay-when-paid. Those money was never received by us, but that's part of the claim they were able to get the jury to provide them, and the district court did not correct. So it's really those four change orders. The two back charges, change orders 8 and 9, one for 127, one for 117, which we are just the conduit, $84,000 of flagman charges that the contract makes them responsible for, but the district court either ignored or the jury ignored, but we seem to be responsible for it. And last but not least, the $111,000 of back charges. The one problem you have is we don't know what, when you put that into a blender, we don't know how that jury came out with $304,000 because the four figures I just gave you are a lot closer to $450,000, but they picked a number of $304,000. Regardless, the 127, the 117, the 84, those are cut and dry. We're not responsible. We're not responsible. We're not responsible. You can quibble over the 111, but we presented evidence as to why we were entitled to back charge for it, and they didn't. The only attack they had on the evidence was, well, those certifications didn't cost you that much money and those as-built drawings didn't cost you that much money, ignoring the 111 days additional we were out there before that point in time and the 120 days we were out there after that point in time, and we only back charged them for 111 days. So it's those four issues and it's the full attorney's fees and the $66,000 of prompt payment penalties, 15% penalty, which should be more like $18,000. I apologize for not having the exact figure. Let me ask you about the flagman before you sit down. It seems to me the way the district court pursued this or allowed it to be presented is the possibility that the jury ended up maybe accepting the contract got amended through oral conversations, through understandings. Are you saying whatever evidence there may have been of such discussions or possible changes predated the execution of the contract? Is the problem with that? Absolutely. I'm saying two things about that issue. I'm saying, first and foremost, that conversation did not take place with somebody from West Coast. If you look at the transcript he cites, it took place with somebody from FH Passion, which is West Coast Parent Company. So it's not a party to this case. That's one. And two, when you read the transcript in context, those conversations took place. He said take that out. But it was in. So those conversations had to take place before. It's not that he said ignore that in the contract. He said take that line item out of the contract. That's what he said. And he's allowed to say whatever he wants to say. I can't stop him. And credibility is credibility. But that's not what the contract said after that conversation. All right, counsel. I think I have 14 seconds, but I'll wait for one more. Thank you. Thank you. Don't get it back. Mr. Alonzo. Mr. Suba. Oh, I'm sorry. Mr. Alonzo. I'm sorry. I'm here on behalf of your honors. I'm here on behalf of Roland Alonzo and RCS contractors. If you will, I'm going to go ahead and address in kind exactly what Mr. Weinsack has previously addressed to you all, and then I have some points that I'd like to get to as well. With respect to the flaggers, which your honor had a specific question about, Mr. Alonzo's testimony was uncontroverted at trial, that they were relieved of any obligation to pay for flaggers. As a matter of fact, Thomas Schutt, the representative for West Coast Corporation, testified that all invoices for flaggers were submitted to West Coast Corporation, that they paid for the insurance. That item was removed from the contract. I believe that we noted that in brief. RCS was not responsible. The insurance was removed from the contract. The railroad insurance. The insurance securing the railroad flagman was removed from the contract. Physically removed. It was in a draft and it was removed from what was executed or what? It was in the executed draft. It says $0. It was actually removed. And Mr. Schutt acknowledged that the flagman would not contract directly with RCS. They contracted with West Coast, and West Coast was ultimately obligated to pay that. West Coast did not back charge RCS for flagman until almost a year after substantial completion of the project. There's a lot of talk of 111 days. And at trial, Mr. Merida, the representative of RCS, testified that they would not be allowed or be able under the contract to charge liquidated damages against RCS if RCS had not caused the delay. It is undisputed at trial that the delay was owner-caused. Dr. Householder, who is an expert of in excess of 30 years in construction management and scheduling, testified that RCS did not delay this project. You will find that in the testimony in the record before you. But with that said, the flagman was removed, whether it was done by a conversation that Mr. Alonzo had with Mr. Prosser. Mr. Prosser was a representative of FH Passion, who was the contractor on the sister project that RCS was working on. They were approached by FH Passion to do this project. It was an exception. It was literally just a little- Just another part of the Baton Rouge system, or what do you mean? There was a big, huge project, and this was one little exception given its proximity to the Mississippi River. That's the only reason the Corps was involved. The Corps had to step in because they had to design that portion of the project, which they did poorly. The project was designed, and RCS was doing the rest of it. I mean, literally, the roadway goes up, the roadway comes down, and there's this one little sliver that they have to basically opt out to the Corps. So all of what we hear about today is this sliver. Yes, sir. We hear about the sliver. It is a fact question, though. It seems to be a fair amount of what you're talking about here. Of course, we have fact finders involved in the trial court about whether these provisions are in or out of the contract, it seems to me. Absolutely. So you're not saying I'd look at a contract and I will find lines slashed through the parts that you are saying are out of the contract. No, sir. That was just how the contract read from the beginning. I mean, the jury saw the contract that talks about flaggers,  but then the actions of the parties subsequent to that was quite different. Help me with what he is characterizing. It seems to me he's saying all of this predates the execution of the contract, about the flaggers anyway. The insurance was removed, and then, again, the actions of the parties throughout the entirety of this project was that the invoices for flaggers went to West Coast and RCS assumed that they were being paid. Brian, an awful lot of the invoices go into West Coast, a variety of things. Is it just a matter of who ultimately is going to be responsible for it? Is it really that significant who is getting the initial invoice? No. All of our subcontractors, we would submit payment applications up the chain to West Coast, and they were supposed to, as a conduit, they were supposed to provide that information to the owner, the court. The problem is, and this is the most important thing about this case, is West Coast did not have access to the court. They had no contract with the court. They had misrepresented themselves to RCS in the beginning, which the jury heard and the jury saw. They had misrepresented in the very beginning that they could provide access to the owner. They could not. They had a contract with Garner Services. Garner Services was the general contract on this project, not West Coast. And just to clarify, F.H. Passions is West Coast. It is the parent company of West Coast. So whenever Mr. Alonzo was dealing with Mr. Prosser in the beginning with F.H. Passions, that's who he thought was going to be the general contractor. That's who represented that they had the contract with the court because they were working on the underlying project. They subsequently let West Coast, their Chicago-based company, come in and do this one little thing. The reality is all West Coast did on this project was some administrative stuff. They had one guy sitting in a trailer next to the project doing we don't know what. RCS self-performed 99.9% of the work on this project. And when he speaks about the concerns at the end of the project, the alleged breaches of contract at the end, all of that came after substantial completion of the project. The project was ready and open to be used. What RCS left on the table, admittedly, was $3,040 for some as-built drawings, which they had provided the preliminary drawings for, and $3,000 for some punchless items on a multimillion-dollar project. We're talking about $6,000 worth of items. A large portion of Mr. Weinstock's brief and his argument to this court stems around that breach of contract. Is it true that they couldn't get paid until the as-built drawings were presented and the punchless was cleared? They had already been paid. They suggest that they couldn't get paid, they couldn't get final payment until this. At this point, all the change orders, the first change order on this project was not submitted. At least the first change order was change order number three. The first change order that actually modified the scope of the contract and actually awarded any monies was not submitted to the court until after RCS had substantially completed the work. They substantially completed the work in early July, and on July 29th, West Coast Corporation sent the first change order to the court or got the first change order approved. That was the first time any monies. What date was that? July 29th, 2012. Ninety-nine percent sure that's the correct date, but it was at the very end of July, Your Honor, and it was after RCS had substantially completed the project. What is the significance in this case about your point that you say went to the jury that West Coast lazily misrepresented whether they're the general contractor or whether they had the contract with the Corps as opposed to someone else? They could not fulfill their obligation under the contract. Their sole and exclusive obligation under the contract was, as any general contractor would be, would be, look, I'm hiring you as my subcontractor. By the contract, you have to submit everything up to me. You have to submit your payment applications. You have to submit your receipts, your invoicing, whatever it is, and then I'm going to turn around and I'm going to hand it to the person that I have a contract with, the Corps. They did not have that contract. They had a contract with Garner Services over here, which was, again, did nothing else on the project. They didn't have a contract with the Corps. They did not have a contract with the Corps. Their parents did. No. No, Your Honor. They had a contract with Garner Services. Garner Services is an additional player in the game here. But they didn't do anything. I mean, I guess they maybe turned around and handed the stuff off to the Corps. But the importance, just to get to your question, the importance of that is, and the district court agreed, is that West Coast could not provide the access that they said they could provide in the contract to RCS because they, too, did not have access to the Corps. And is that where the ‑‑ does that involve the judge putting the word direct into it? Yes, Your Honor. And I believe that, you know, not to discount what Mr. Weinstock said, but I believe that that was ‑‑ We disagree with some other things. But the ‑‑ that comes from the court's ruling whenever they modified the jury's verdict. And I believe that they probably pulled that from one of either of our briefs when they just added the direct word. It is completely immaterial. Access is what they promised. Access is what they could not provide. It's that simple. Well, he liked the word conduit. Is that a contractual word, that there were going to be a conduit to the Corps? Yes, sir. Is that in the contract? The specific language in the contract, if I may, the contractor under this provision merely acts as a conduit to provide the subcontractor access to the owner, which would have been the Corps, to seek reimbursement for damages incurred for delays caused by the owner and its agents. We know that all the delays in this project were caused by the owner, and we know that RCS incurred damages because of those delays. That's what those change orders were about. And that is what, again, what the jury heard and what the jury found. The jury didn't find that West Coast Corporation had breached their contract to RCS. They found that they had breached their contract to RCS in bad faith, that they knowingly went into this knowing that they could not fulfill the obligations that they suggested that they could fulfill. And that's where, you know, our concern comes in. And I'm going to say this. If there was evidence that had they done this in a timely fashion, you would have been paid. They would have been paid and you would have been paid. Absolutely. I mean, you can't submit change order requests after the project's already – I mean, I would assume under their contract they had a temporal period where they had to also submit those requests. When the court gets requests that are so delinquent, of course they're not going to honor them or they're going to whittle them away. At this point, they're not submitted contemporaneous with the actual work being performed on the project. Again, all stuff that was presented to the jury. So I believe I addressed the flagman concern, and I think that I hope that I've adequately addressed the access, you know, the direct access concern that Your Honor had. But with respect to the back charges, again, I note that Michael Merritt, the representative from West Coast Corporation, testified that RCS would not be responsible for liquidated damages if they were not responsible for the delay. Dr. Haushalter testified at trial that's in the record that RCS was not responsible for any of the delays. He is an expert in scheduling. He counted the days, but for all of these other delays that were owner-caused delays, RCS did not delay the project. Also, we find it very almost disingenuous that they would suggest that the 111 days that it took them to complete the project after it was actually complete. Substantial completion was in July of 2012. They did not back charge RCS until March of 2013, you know, almost a year later, at which point this was whenever Mr. Alonzo was knocking on the door saying, hey, where's the money that you owe me? And it was an effort on their part to keep what they had already collected. Mr. Merritt testified, and it is in the record, he testified that they had received over $240,000 from the owner that was earmarked for RCS, and they actually executed a certification saying that they had paid RCS that money, but they did not. And now they come back 18 months after the fact or several months after the fact and suggest that, well, we were holding that because we were going to back charge you. Well, you didn't calculate those back charges until way after the end of the project, and those back charges, again, included nothing more than $3,000 to complete some punchless items, which if I recall correctly was like dirt on the side of the road or maybe some debris that needed to be cleaned up, and the as-built drawings, which the preliminary drawings had been provided by RCS contractors. That's why it only cost them $3,000 to reproduce them. They didn't have to do anything but take the preliminaries and have a stamp put on them marking them as-built. Just to mark it as-built. As-built drawings are basically, at the end of the project, it's the contractor saying, this is what we've done, this is what we've built here, and you can see it. It's kind of the layout of design. Mr. Alonzo had provided them with the preliminary as-built drawings. They just weren't certified. Like, you know, an inspector hadn't stamped them. So to suggest that it took 111 days to pick up some dirt, clean up some debris, and get the final as-built certified is completely ridiculous, and that, too, is what the jury heard and why the jury found that they had breached their contract in that phase. What did that have to do with the lack of attachment or whatever it was? The most important thing about the way everything was attached stems from that first delay. There were two delays in this project, the first one which lasted pretty long and was kind of intervened by the Mississippi River rising because there was a flood event at the time. The most important thing about the slip, it's a slip joint, is if the joints were mechanically restrained, i.e. if they were, like, bolted together, then it would have been a completely different, it was going to require a completely different redesign. If they were slip joints, meaning they just literally just, like, one side is smaller than a bigger, and it just kind of, you know, the weight of the dirt and all the earth on top of it holds them together. That's, the Corps could not explain whether or not they were restrained or not, but we knew that on both sides of them they were, and we knew that the pipes were coming in, and they were going down, and then they were going this way. The only way those pipes would have been able to take the pressure of sewage moving through them at that angle was if they were mechanically restrained. So we, RCS, suggested to the Corps before we ever, before we ever started working on the project that they were mechanically restrained, and we were probably going to end up having to redesign the whole project. West Coast said no. Put the dewatering system on the ground, get out there, and start digging this up because they could start billing and charging the Corps for the system and the work. Start doing the work. They get in there, and what is the first thing they discover? The joints are mechanically restrained. They are. They are. So they have to immediately stop the project. And that's whenever the redesign comes in. Hugh Vaughan Associates, of course, they ask us, do you know anyone who can do this, who can redesign the project? Yes, we've worked with Hugh Vaughan Associates before at Lafayette. Excuse me. We bring them in, and they redesign the project. It takes a few months to get the redesign done, and ultimately the project is back on course. But it's only after, you know, like a six-month delay between commencement of construction and when that was completed. I have another question. Are you satisfied, Judge Dennis? I was thinking the other way around. I was thinking if they weren't restrained. In the plans, they weren't mechanically restrained. They had to be mechanically. That was the whole thing is the project had to be redesigned because it was going to require mechanically restrained joints, and that wasn't accounted for in the original plans. And that's why Mr. Alonzo was saying, look, I'm pretty sure these are going to need to be mechanically restrained because he knew that the force of the— But it turned out you didn't have to do that. Is that right? No, sir. They had to redesign the plans and specifications. I thought you said they found that they were restrained, which would mean they wouldn't have to redesign it. They're removing what's existing and putting new stuff down. That was the whole point. They were replacing a segment of the sewage system. Anytime you do a construction project, you have to do the underground work first, which is usually sewage or drainage. Okay, go ahead. Let me ask you about the Louisiana Prop Payment Act. It seems to me that you had one specific amount that the jury heard, about $127,000, and you didn't have any other specific late payments that you gave to the jury, and the jury still came up with this figure, which is a percentage of the amount that they had to decide was late. It doesn't add up to anything, not addition. It doesn't multiply to anything that was specific in your evidence. And you had some general evidence, it seems to me, about money that may have been paid late. What is different, maybe is the way I want to ask this, about the $127,000 and the other late payments that must have gone into that? Why was there no other specific late payment? The $127,000 was not necessarily a late payment. That was an unconditional tender that Mr. Weinstock instructed his client to make once he enrolled his counsel about two years after we had filed the lawsuit. At that time, he instructed them to pay those undisputed sums, which they did. But a week before trial, they made another payment of undisputed sums that they had found through some calculations as well, and then the jury awarded the plaintiff. They found that they had received and withheld additional sums, and their award was $304,000 for the breach of contract, which included bad faith breach, and then they also awarded over $400,000. I mean, the original award was $777,000. Now, granted, the judge remitted some of that because a lot of it had to do with home office, extended home office overhead, which we took no issue with. We did not challenge the remitter, and that was ultimately remitted. That's all the time I have, unless I have not properly answered your question. Well, if you have anything further you think is necessary to answer it, go ahead. I'll make it short. I mean, the only thing that I would suggest is that when it comes to the Prompt Payment Act, the jury found that they received and withheld monies in excess of the $127,000, completely separate and apart from that, and the jury had to award that to us. That means everything that happened between filing suit to trial and where we are today. All of that had to be accomplished, and it's part of the act. Thank you. Thank you, Your Honor. Thank you, sir. Mr. Weissach, you have appointments. You said you only wanted to say four, but I'll give you five. Thank you. On this last point about the $127,000, not turn it to you, but if you note on page 48 of our brief, we specifically show that was the one place where they presented evidence of money we were paid and did not pay them. We were paid $240,000. We owed a certain amount of money of that. That's what he stated a minute ago. Of that, $127,000 was clearly their money. We did not pay them. We issued them a letter in October of 2012 explaining why we weren't paying them, but that was the only place where they showed evidence of what we were paid and did not pay them. Most of this claim has been about the back charge – I'm sorry, the delay damages, which we were never paid to this day. I want to go back to the first thing you asked about, which was the flag man. He's fading and switching to a degree. This is a government contract. Everybody grabs whatever piece they can because they get to upcharge it. We grabbed the railroad insurance because we can charge a premium to the federal government for it. Sorry, that's the way the system works. He wanted the insurance. We took the insurance. He accepted that, but the contract never said we would be responsible for paying the flag man. Wasn't this just a fact issue that went to the jury about potential understandings that occurred after this? Why isn't this a jury question? Because it's strictly a contract question, which Mr. Alonzo tested. But you can change a contract under Louisiana law by action and by oral agreements and whatever else. I completely agree. If you spoke to West Coast instead of F.H. Passion, listen to what he's saying carefully. F.H. Passion started it and then said actually West Coast is going to handle it. The contract was not with F.H. Passion. He keeps saying we would bait and switch F.H. Passion, F.H. Passion, and then West Coast came. The day he signed the contract, he sure knew it was West Coast and he sure knew Garner was the general contractor because it says it in the contract, as does line item 50. So now he's talking to Mr. Prosser, who's not with West Coast. He's with F.H. Passion, so he's not even a party. This is your parent company. It is a parent company, but there's no testimony about that. I mean about it being some kind of veil-piercing argument. That's one, but then the second most important thing is put it in context as to when the conversation took place. It clearly took place by the pages he cited before he signed the contract. So, yes, he could say whatever he wants, but once he signed the contract, that's what's in it. He's not claiming those conversations took place after the fact because they took – look at the testimony, his own client's testimony. Next thing about the 111 days, Dr. Haushalter absolutely gave a conclusory statement. I don't fault RCS for any of the delays in this case, but then on cross-examination, we went through the daily logs, and he acknowledged. They disappeared for months and weeks at a time, no dispute, no explanation. Well, they were gone for 111 days. It seemed to me part of what the response was, and maybe for some of these other breaks. Are you saying that RCS had to have their people out there for this whole period without knowing when the delay was going to end? No, this was not – okay, this is not the – I mean there were other delays, not just the 111, but there were other long delays. Right, that were unexplained other than RCS didn't show up. Not the 190-day delay for the redesign, not the 45-day for the leaking valve, just 111 other days where they just didn't appear for several weeks at a time. And that's what Dr. Haushalter conceded. And I want to get back to this point about when people were paid and change orders. The very first change order in this case was a direct payment of $250,000 as an advance to RCS because there were so many difficulties in getting payment. The court just agreed to a $250,000 advance to put money in their pocket because they were expending money. We didn't take a dime of it. We didn't get paid anything out of that $250,000. The Asbilt drawings, he absolutely said, I gave him preliminaries, but then he conceded on cross-examination in face of an e-mail that he said no, I held them hostage until they gave me my money. And then the other thing that we haven't talked about much is the mutual breach, which their expert clearly conceded. There was mutual breach in this case, which under Louisiana law says we can't be held liable to breach of contract. And I would point you to page 3701-02 of the record. They've made the allegation that we've somehow waived this and it's not de novo review. But if you go back to the original argument at those two pages, we clearly talk about them being in breach so we can't be in breach. My time is up. Thank you very much for your patience. Thank you very much.